IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ODELL MOSLEY (R47946),[1] | ) |
|     Petitioner, | )    Case No. 12 C 6442 |
| | ) |
|     v. | )    Judge Joan B. Gottschall |
| | ) |
| MICHAEL ATCHISON, Warden, | ) |
| Menard Correctional Center, | ) |
|     Respondent.[2] | ) |

## MEMORANDUM OPINION AND ORDER

On December 11, 1989, Judith Wallace was robbed and bludgeoned to death in her apartment on Chicago's South Side. The murder remained unsolved for many years but following a 2005 jury trial in the Circuit Court of Cook County, Mosley was found guilty of first degree murder and sentenced to a 30-year term of imprisonment. Mosley's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the court. For the following reasons, the petition is denied.

### I.     Background

The following facts and procedural posture relevant to Mosley's § 2254 petition are drawn from the Illinois Appellate Court's opinion in Mosley's direct appeal, *People v. Mosley*, No. 1-05-3879 (Ill. App. Ct. Aug. 6, 2008) (unpublished order) (Dkt. 18-2), and the state court record (Dkt. 18 and 32). This court will presume that the state court's factual determinations are

---

[1] The Illinois Department of Corrections and some state court documents spell petitioner's last name "Mosely." The court will use the spelling "Mosley" since it appears on Mosley's *pro se* pleadings.

[2] The current warden of the Menard Stateville Correctional Center is Rick Harrington. Accordingly, Rick Harrington is substituted as the respondent. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts; *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

correct for the purposes of habeas review as Mosley neither contests them nor points to clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002).

### A.     Facts

Judith Wallace lived alone in a third-floor apartment at 6808 South Ridgeland Avenue in Chicago. One of Judith's sons, Gregory Wallace, spoke to his mother on December 11, 1989.[3] Alarmed by his mother's failure to report to work two days later, Gregory went to Judith's apartment, where he found her dead body on the kitchen floor. Detective Tom Kelly responded to Gregory's call to the police. Kelly noticed that a kitchen drawer was partially open and the contents of a purse were spilled on Judith's bed.

An autopsy revealed that Judith died from cranial cerebral injuries due to multiple blunt force trauma. She had multiple lacerations to her head and face, abrasions to her leg and arm, and skull fractures. Her head injuries were consistent with being struck with the claw of a hammer, and the injury to her leg and arm could have been caused by someone kicking her.

An anonymous tip led Kelly to Arbenny Dennis, who lived on the first floor of Judith's apartment complex.[4] Kelly recovered a wooden hammer handle from Arbenny's apartment. Another one of Judith's sons, Jesse Wallace, told Kelly the hammer his mother normally kept in

---

[3] To promote clarity, the court will refer to the members of the Wallace family by their first names.

[4] Brothers Arbenny and Romance Dennis were involved in the events surrounding Judith's death. As with the Wallace family, the court will refer to Arbenny and Romance by their first names to promote clarity.

a kitchen drawer was missing.  The hammer handle was never identified as Judith's and the police did not charge Arbenny in connection with Judith's death.

Shortly after the murder, the Wallace family offered a $2,500 reward for information about Judith's death and posted reward flyers in the courtyard of Judith's building and the surrounding area.  Romance Dennis, Arbenny's brother, testified at trial that he regularly visited family members living at the apartment complex on Ridgeland.  Romance saw Arbenny remove reward posters while stating he did not want "them" blaming or "putting" the murder on him. Dkt. 18-2 at 3.  Subsequently, Romance, Arbenny, and Mosley were hanging out together and the subject of the reward posters came up.  Romance heard Arbenny threaten to kill Mosley or a member of his family if Mosley said anything about the murder.  He also heard Mosley make the same threat to Arbenny.  A few months later, Arbenny told Romance he "better not talk about the four on the nine-one." Dkt. 32, Resp. Ex. A(3) at LL80.  Romance understood that "four" was a Gangster Disciple code for secrecy and "nine-one" stood for murder.  Arbenny died in September of 2000.

Felicia Butler also resided at the Ridgeland apartment complex in 1989.  She knew Arbenny and Mosley and saw them together several times a week in the neighborhood.  Butler could not identify Mosley at trial, but positively identified him in a photograph attached to a handwritten statement she gave to the police in 2003.

In 2001, Sergeant James Washburn was a detective in the Chicago police department's "cold" case unit and was assigned to investigate Judith's murder.  As part of his investigation, he contacted Romance to discuss Arbenny's potential involvement.  It was disclosed at trial that Romance had a 1998 felony conviction for burglary, pleaded guilty to a robbery in 1992, pleaded

guilty to delivery of a controlled substance in 1997, and was convicted of possession of a controlled substance in 2000. He received probation, but violated the terms of his probation by committing theft in June of 2002. In August of 2002, while incarcerated at the Cook County jail for his probation violation, Romance reached out to Washburn and offered to give him information about Mosley's involvement in Judith's murder. Romance acknowledged at trial that he offered to assist the police due to his own legal troubles.

After Romance and Washburn spoke, Washburn asked Romance if he would be willing to wear an electronic recording device while speaking with Mosley. According to Washburn and Romance, no promises were made in exchange for Romance's assistance. Before allowing Romance to wear the recording device, Washburn wanted to confirm that Romance knew Mosley. Thus, Washburn had the Cook County Jail release Romance into his custody, gave Romance civilian clothing, and placed him in a location in the Cook County criminal court building where he could be observed, as Washburn believed Mosley would be in the building that day. Washburn and other police officers saw Romance and Mosley speak, and Mosley gave Romance his contact information.

Romance agreed to wear the recording device and arranged several meetings with Mosley. On December 19, 2002, while Romance was wearing the recording device, Mosley told Romance he and Arbenny had been involved a murder. Dkt. 32, Resp. Ex. A(3) at LL109. At trial, the State played the tape for the jury and the jurors were provided with a transcript of the tape as an aid to help them follow the audio. *Id*. at LL16, LL126; Dkt. 32, Resp. Ex. D(3) at 00299-00302 (the State's version of the transcript used at trial); 00303-00306 (alternative State

version); 00307-00312 (defense version).[5]

Jurors heard Mosley admit he and Arbenny agreed not to discuss the murder of a white female. Mosley nevertheless told Romance that he and Arbenny broke into a "white lady's house that stayed over in the area" so they could rob her to obtain drug money. Dkt. 32, Resp. Ex. A(3) at LL110. Mosley then stated that he and Abrenny were under the influence of drugs and described how they "started commencing to kill her." *Id*. Arbenny "cracked" the victim's head with a hammer while Mosley kicked her and saw "shit pushin' out her head." Dkt. 32, Resp. Ex. D(3) at 00300-01. The men then took money from the victim. Dkt. 32, Resp. Ex. A(3) at LL111. Mosley acknowledged he knew that Arbenny subsequently took reward posters down and stated he remained silent about his involvement in the murder so he would not be charged as an accessory. Dkt. 32, Resp. Ex. D(3) at 00301.

During trial, Romance testified he understood he and Mosley were discussing Judith's murder. At the time of his testimony, Romance had no charges pending against him and the State disclosed that he received $1,000 after testifying before a grand jury due to his cooperation with the police. Mosley unsuccessfully sought to quash his arrest based on the lack of probable cause. A jury found Mosley guilty of first-degree murder and he was sentenced to a 30-year term of imprisonment.

---

[5] The three versions of the transcript are only slightly different and substantively are essentially identical. Although Mosley states that there are discrepancies between the three versions, he does not claim the trial court erred in using the State's first version of the transcript or explain why the differences are relevant. The court will thus not discuss any differences between the transcripts. It also notes the parties did not provide a citation to the record for the transcripts. The court located the three versions on its own. They include handwritten notations by unknown authors which the court has not considered.

B.  **Procedural Posture**

1. **Direct Appeal**

Mosley appealed with the assistance of counsel, arguing:

1. He was denied due process as he was not proven guilty beyond a reasonable doubt since "the State's evidence indicated at most, that [Mosley] was accountable in the assault and probable murder of someone – but the State failed to prove beyond a reasonable doubt that the 'someone' was in fact Judith Wallace." Dkt. 18, Resp. Ex. D at 11;

2. Although Mosley's counsel did not object, the trial court should not have permitted Detective Kelly to offer hearsay testimony from Jesse Wallace (one of Judith's sons) that his mother kept a hammer in her kitchen drawer that was missing after her murder; and

3. Trial counsel was ineffective because:

    a. During the hearing for Mosley's motion to quash his arrest, he failed to object to Sergeant Washburn's references to Judith Wallace when discussing the taped confession, even though Mosley never mentioned the name of the victim; and

    b. During trial, he failed to object to Detective Kelly's testimony regarding Jesse Wallace's comments about the hammer.

Doc. 18, Ex. D. On August 6, 2008, the Illinois Appellate Court affirmed. Dkt. 18, Resp. Ex. B.

Mosley filed a *pro se* petition for leave to appeal ("PLA") with the Illinois Supreme Court, raising fifteen claims:

1. He was innocent;

2. Trial counsel was ineffective for refusing to subpoena telephone records;

3. Appellate counsel was ineffective for failing to attach copies of the three versions of the audio transcripts to the brief;

4. He was not given *Miranda* warnings;

5. He was questioned for five days before the court considered whether probable cause supported his arrest;

> 6. He was denied the assistance of a qualified forensic acoustics expert to authenticate the recorded confession;
>
> 7. He was denied the assistance of a voiceprint expert;
>
> 8. The trial judge had a conflict of interest because he also presided over the trial of Romance, the prosecution's main witness;
>
> 9. There was a conflict of interest with the jury because the victim's son was a policeman and some of the jurors had connections to the police;
>
> 10. The trial court improperly allowed different audio equipment to be used at trial than was originally used to play the recording;
>
> 11. He was not timely furnished a copy of the order authorizing the recording of his conversation;
>
> 12. Sergeant Washburn's testimony during the hearing on the motion to quash his arrest and at trial was contradictory;
>
> 13. At the bond hearing, the prosecution misrepresented the contents of the recorded conversation;
>
> 14. He was denied DNA testing; and
>
> 15. The recorded conversation violated his constitutional right to privacy.

Dkt. 18, Resp. Ex. G. On May 28, 2009, the Illinois Supreme Court denied the PLA. Dkt. 18, Resp. Ex. F.

### 2. State Post-Conviction Appeal

On December 1, 2009, Mosley filed a *pro se* petition pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS § 5/122-1. Dkt. 32, Resp. Ex. D at C18-97. The trial court denied the petition as frivolous on February 22, 2010. Dkt. 32, Resp. Ex. A at C15. On March 17, 2010, Mosley filed a notice of appeal and counsel was appointed. Dkt. 32, Resp. Ex. A at C17. On February 29, 2012, the Illinois Appellate Court granted Mosley's motion to terminate representation by appointed counsel and to allow him to proceed *pro se*. Dkt. 18,

Resp. Ex. H. Mosley requested and obtained an extension through June 1, 2012, to file his opening brief. Dkt. 18, Resp. Ex. I. The respondent asserts Mosley never filed a brief. In his federal habeas petition, Mosley characterizes the pursuit of his state post-conviction appeal as "without question . . . a waste of time." Dkt. 1 at 3.

      **3.     Federal Habeas Petition**

On August 14, 2012, Mosley filed a § 2254 petition dated July 31, 2012 raising numerous claims:

1. He was arrested without a valid warrant;

2. He was questioned for four days without *Miranda* warnings;

3. He was originally charged under a statute that did not exist;

4. There was insufficient evidence against him, and the recording of him talking about his involvement in a murder was falsified;

5. The trial judge improperly denied his request to have a voiceprint expert authenticate the original audiotapes, as opposed to compact discs;

6. The trial judge was biased because he also presided over criminal proceedings involving Romance, the prosecution's main witness;

7. Jurors were friends and relatives of Chicago police officers and an Illinois State trooper and were thus biased since Judith's son was a police officer;

8. The trial court improperly refused to allow him to file a *pro se* motion to vacate the jury verdict based on ineffective assistance of trial counsel;

9. The recording of his alleged conversations with Romance violated his right to privacy and unspecified individuals should have told Illinois governmental officials that his voice was not on the recording and he was being framed;

10. Trial counsel was ineffective for:

    a. Lying to Mosley, telling him an expert authenticated the recordings, and declining to obtaining a written report about the authenticity of the recordings because it would not be favorable to the defense when Mosley

          knew the recordings were fabricated and his appointed counsel had falsified the documentation regarding the authentication of the recordings;

    b.      Failing to point out unspecified discrepancies in the three versions of the transcripts of the recordings (two prepared by the State and one prepared by the defense);

    c.      Failing to interview or cross-examine witness Felicia Butler;

    d.      Failing to interview Romance Dennis, the States' main witness;

    e.      Refusing to inform Mosley whose fingerprints were at the crime scene and stipulating that Mosley's fingerprints were found there;

    f.      Failing to investigate Odell Everette, the only Odell that Romance's family knew, or appropriately pursue evidence to disprove Romance's claim that his family knew Mosley;

    g.      Refusing to request a DNA test when "a first year law student would have asked for [it]";

    h.      Refusing to subpoena telephone records that would have shown he did not speak to Romance on the dates asserted by the State, including the day of the alleged confession that was recorded and used against him at trial;

    i.      Failing to subpoena jail records that would have shown that Romance called Mosley when Romance was incarcerated at the Cook County Jail.

11.    Appellate counsel was ineffective for failing to argue that:

    a.      The audio tapes were not authenticated by an expert;

    b.      Trial counsel was ineffective for failing to subpoena telephone records;

    c.      There were discrepancies between the three transcriptions of the recording of the alleged confession;

    d.      The trial judge should have allowed him to file a *pro se* motion to vacate the jury verdict;

    e.      Trial counsel lied about having the audio tapes authenticated by an expert; and

    f.      The State violated Illinois's eavesdropping laws.

> 12. He is innocent and wrongfully imprisoned due to the State's "outrageous corrupt conduct."

Dkt. 1.

The respondent filed a motion to dismiss Mosley's petition based on failure to exhaust but withdrew the motion and answered after Mosley abandoned his state post-conviction appeal. Mosley also filed motions asking this court to obtain the recordings of his allegedly falsified recorded conversations with Romance (Dkt. 17), strike the respondent's motion to dismiss (21), to rule on his motion to obtain recordings (Dkt. 22), and "for an elaborate perspective as it relates to the falsified evidence against petitioner and to order respondent to present to this court and petitioner the same elaborate perspective" (Dkt. 30).

## II. Discussion

For the reasons discussed below, Mosley is not entitled to federal habeas relief as: (1) he may not relitigate his trial before this court; (2) with the exception of his sufficiency of the evidence claim, the claims in his § 2254 petition are procedurally defaulted as he did not present them in one full round of state court proceedings and none of the exceptions to procedural default are applicable; and (3) his sufficiency of the evidence claim is meritless.

### A. Scope of Federal Habeas Review and Standard of Review

In his filings, Mosley repeatedly voices his dissatisfaction with the State's decision to prosecute him, the evidence presented at trial, the jury's verdict, and the judges and attorneys involved with his state court direct and collateral litigation. As Mosley argues that this court should revisit the state court proceedings and find he is not guilty of murdering Judith Wallace, the court begins by providing an overview of its role when considering a habeas corpus petition filed by a state prisoner.

The writ of habeas corpus is known as the Great Writ due to the vital role it plays in safeguarding constitutional rights. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Nevertheless, its scope is limited by procedural rules that govern whether the court may reach the merits of a petitioner's claim. It is also statutorily limited as under 28 U.S.C. § 2254, a federal court considering a state habeas petition must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In making this determination, the court must consider if the challenged state court decision is "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See Williams*, 529 U.S. at 405. With respect to the "unreasonable application" prong of § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id*. at 407. A state court's application of Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *Harrington v. Richter*, — U.S. —, 131 S.Ct. 770, 786 (2011) ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable").

Moreover, as noted above, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination

of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With these fundamental principles in mind, the court turns to Mosley's claims.

### B. Procedural Default

#### 1. The One Full Round Doctrine

A petitioner must present his claims to all levels of the Illinois courts to avoid procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Thus, the court must determine if Mosley presented each of the claims in his federal habeas petition to the state trial court, the Illinois Appellate Court, and the Illinois Supreme Court. *See Castille v. Peoples*, 489 U.S. 346, 349 (1989) (failure to present claim to state intermediate court means it is procedurally barred); *O'Sullivan*, 526 U.S. at 844 (failure to present claim to state's highest court means it is procedurally barred).

At the trial level and in his direct appeal, Mosley argued the evidence was insufficient and in his direct PLA, he argued he was innocent. Construing these arguments broadly given Mosley's *pro se* status, the court finds that Mosley avoided defaulting his sufficiency of the evidence claim by presenting it at all three levels of his direct proceedings.

To the extent that Mosley presented the remainder of his federal claims to the state courts, they only appear at the intermediate appellate court level in his direct appeal or his PLA in his direct appeal. As noted above, a petitioner must "assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings . . . . This means that the petitioner must raise the issue at each and

every level in the state court system, including levels at which review is discretionary rather than mandatory." *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). In addition, because Mosley abandoned his state collateral appeal before filing a brief with the Illinois Appellate Court, by definition he cannot have satisfied the one full round requirement for any of his post-conviction claims given the lack of a full round of post-conviction review. Accordingly, with the exception of Mosley's sufficiency of the evidence claim, all of the claims in Mosley's § 2254 petition are procedurally defaulted.

### 2.  Exceptions to Procedural Default

A federal court may not grant relief on a procedurally defaulted claim unless the petitioner can establish cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that the court's failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). For the following reasons, neither exception is applicable.

#### a.  Cause and Prejudice

Cause exists where "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 282 n.24 (1999). Nothing in the record before the court indicates that an objective factor caused Mosley to default his claims. In addition, Mosley chose to abandon his state post-conviction appeal because he thought a negative result was preordained. However, the respondent's motion to dismiss based on failure to exhaust explicitly stated that if Mosley did not pursue his state post-conviction remedies, any claims raised in his post-conviction petition would be procedurally barred. Dkt. 18 at 11-12. The respondent also noted that if Mosley chose

to rely on his direct proceedings, his sufficiency of the evidence claim was, in the respondent's view, the only non-defaulted claim in his § 2254 petition.

The rules governing procedural default are often complex and can be confusing to *pro se* litigants. However, in this case, they are straightforward: as noted in the respondent's motion, Mosley was required to present his claims through one complete round of state court review to avoid default. Even with the benefit of the respondent's warning about procedural default, Mosley nevertheless chose not to pursue his state post-conviction appeal and, instead, filed multiple motions before this court attacking the jury's verdict. The Seventh Circuit has "specifically rejected the argument that a petitioner's *pro se* status alone constitutes cause in a cause-and-prejudice analysis." *Smith v. McKee*, 598 F.3d 374, 385 (7th Cir. 2010) (collecting cases). Mosley, therefore, is bound by his decision to abandon his state collateral appeal. As he cannot establish cause, the court will not address prejudice. *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010).

The court acknowledges that the Supreme Court recently carved out a "narrow exception" to the usual rule that a petitioner's *pro se* status or the ineffective assistance of counsel during initial-review collateral proceedings cannot establish cause for the default of an ineffective assistance of trial counsel claim. *Martinez v. Ryan*, — U.S. —, 132 S. Ct. 1309, 1320 (2012); *Trevino v. Thaler*, — U.S. —, 133 S.Ct. 1911 (2013). Specifically, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 132 S. Ct. at 1320.

The *Martinez-Trevino* exception does not help Mosley as he included extensive arguments about his trial counsel's allegedly deficient performance in his *pro se* post-conviction petition. His default is based on his decision to fire his appointed post-conviction appellate counsel and then, once he was proceeding *pro se*, to abandon his post-conviction appeal. He thus did not default his ineffective assistance of trial counsel claims due to the lack of counsel or ineffective assistance of appellate counsel during initial-review collateral proceedings. *See United States ex rel. Fleming v. Chandler*, No. 12 C 5190, 2013 WL 589559, at *5 (N.D. Ill. Feb. 14, 2013) ("*Martinez* does not apply to procedural defaults based on omissions during the [post-conviction] appellate process"). Cause and prejudice thus does not excuse Mosley's default.

### b. Fundamental Miscarriage of Justice

The court next considers the fundamental miscarriage of justice exception, which applies in "situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002), *citing Schlup v. Delo*, 513 U.S. 298, 327 (1995). To show "actual innocence," a petitioner must present clear and convincing evidence that, but for the alleged error, no reasonable juror would have convicted him. *Id*. To satisfy this standard, Mosley "must support the innocence claim 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010) (quoting *Schlup*, 513 U.S. at 324).

Mosley vigorously argues that the recordings used against him during trial were fabricated and the statements were not about Judith Wallace's death so the State failed to prove

his guilt beyond a reasonable doubt. The actual innocence exception to procedural default, however, does not permit the court to grant habeas relief based on the petitioner's view of the evidence. *See United States ex rel. Centeno v. Hardy*, No. 10 C 1958, 2010 WL 2990043, at *2 (N.D. Ill. Jul. 20, 2010) (rejecting actual innocence claim based on the petitioner's dissatisfaction with the state court's rejection of his motion to suppress where this issue was litigated in the state court proceedings, as "[the petitioner's] 'actual innocence' argument is fundamentally no different from the claim of any other habeas petitioner who feels that the state court got it wrong."). Mosley has also not identified any new evidence demonstrating that, but for the alleged error, no reasonable juror would have convicted him. Thus, the actual innocence exception does not apply. This means Mosley avoided procedural default for only one claim: sufficiency of the evidence.

C.     **Sufficiency of the Evidence**

The Illinois Appellate Court considered and rejected Mosley's argument that the State failed to establish that the victim of the murder discussed on the recorded conversation was Judith Wallace and that the evidence was insufficient to establish guilt beyond a reasonable doubt. It first noted that its function when reviewing a challenge to the sufficiency of the evidence "is not to retry the defendant." Dkt. 18, Resp. Ex. B, citing *People v. Sutherland*, 223 Ill.2d 187, 242 (Ill. 2006). It then summarized the standard: whether, when viewing the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Next, the court reviewed the State's evidence about Wallace's murder, including testimony that the type of head and leg injuries Judith suffered were consistent with the modes of injury described in the recording (striking Judith in the head with a hammer and kicking her); a hammer handle with a missing head was found in Arbenny's apartment; Arbenny ripped down reward posters; Arbenny and Mosley made a pact not to discuss the murder, were together near Judith's apartment complex near the time of the murder, and a detective found the contents of Judith's purse emptied on her bed; and Arbenny and Judith lived in the same apartment building. *Id*. at 7-8. It also noted that the jury was made aware of factors relevant to Romance's credibility. *Id*. The court then concluded that because the details about Judith's murder were consistent with Mosley's recorded statements about how a female victim was robbed and murdered, the jury was entitled to conclude that Mosley was referring to Judith's murder in the recorded conversation.

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), governs this court's evaluation of the state courts' rejection of Mosley's sufficiency of the evidence claim. In its opinion, the Illinois Appellate Court expressly relied on *Jackson* and correctly identified the standard announced in that case. Thus, its decision was not "contrary to" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). *See Hardy v. Cross*, — U.S. —, 132 S.Ct. 490, 494 (2011) (when a state court identifies the correct Supreme Court standard, its decision is not "contrary to" clearly established federal law); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) (a "decision applying the correct legal rule to the facts of a case is not 'contrary to' within the meaning of §2254(d)(1).").

The court next considers whether the decision was "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Mosley asserts that the jury should have accepted the defense's version of events and rejected the prosecution's evidence. However, "[f]ederal courts are in no position to redetermine the credibility of witnesses observed by state trial courts." *Kines v. Godinez*, 7 F.3d 674, 678 (7th Cir. 1993); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (a federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

The details of the murder and the subsequent conduct described in the recording are consistent with Judith's death and actions taken by Mosley and Arbenny afterwards. Mosley is entitled to maintain his personal belief that the recordings do not establish guilt and are suspect. However, controlling Supreme Court precedent holds that habeas relief is not available if the evidence, when viewed in the light most favorable to the prosecution, would allow a "rational trier of fact . . . [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319. The evidence presented during Mosley's trial easily satisfies this standard. Accordingly, the state courts' rejection of Mosley's sufficiency of the evidence claim was not "an unreasonable application of" the clearly established law announced in *Jackson*. Thus, Mosley's sufficiency of the evidence claim fails.

### III. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, which provides that the district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant," the court turns to whether a certificate of appealability should issue.

Under 28 U.S.C. § 2253(c)(2), "(1) [a] certificate of appealability may be issued only if the prisoner has at least one substantial constitutional question for appeal; (2) [t]he certificate must identify each substantial constitutional question; (3) [i]f there is a substantial constitutional issue, and an antecedent non-constitutional issue independently is substantial, then the certificate may include that issue as well; (4) [a]ny substantial non-constitutional issue must be identified specifically in the certificate; [and] (5) [i]f success on a non-constitutional issue is essential (compliance with the statute of limitations is a good example), and there is no substantial argument that the district judge erred in resolving the non-constitutional question, then no certificate of appealability should issue even if the constitutional question standing alone would have justified an appeal." *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003).

For the reasons stated in this order, the court finds that Mosley has not made a substantial showing of the denial of a constitutional right as he has not demonstrated "that reasonable jurists could debate whether the challenges in his habeas petition should have been resolved differently or that his petition adequately shows a sufficient chance of the denial of a constitutional rights that he deserves encouragement to proceed further." *Rutledge v. United States*, 230 F.3d 1041, 1047 (7th Cir. 2000). Accordingly, the court declines to issue a certificate of appealability.

## IV. Conclusion

For the above reasons, Odell Mosley's request for a writ of habeas corpus under 28 U.S.C. § 2254 and his related motions [Dkt. 17, 21, 22, 30, and 36] are denied. The court declines to certify any issues for appeal under 28 U.S.C. § 2253(c). The clerk is directed to substitute Rick Harrington as the respondent and enter a Rule 58 judgment terminating this case.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 10, 2013